J-S89033-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: D.D.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.N., FATHER | No. 107 EDA 2016 |

Appeal from the Decree December 11, 2015
in the Court of Common Pleas of Philadelphia County Family Court
at No(s):
CP-51-AP-0000183-2015
CP-51-DP-0000110-2013

| | |
|---|---|
| IN THE INTEREST OF: L.A.N., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.N., FATHER | No. 149 EDA 2016 |

Appeal from the Decree December 11, 2015
in the Court of Common Pleas of Philadelphia County Family Court
at No(s):
CP-51-AP-0000182-2015
CP-51-DP-0001492-2012

BEFORE: SHOGAN, MOULTON, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED January 13, 2017**

M.N. ("Father") appeals from the decrees entered in the Philadelphia County Court of Common Pleas, which involuntarily terminated his parental rights to minor children, D.D.M. and L.A.N. ("Children"), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, and simultaneously held that the adoption of the Children could proceed in accordance with the goal change. Father's counsel has filed a petition to

---

[*] Former Justice specially assigned to the Superior Court.

withdraw and an **Anders** brief.[1]   We affirm and grant counsel's motion to withdraw.

We adopt the facts and procedural history set forth by the trial court's opinion.  **See** Trial Ct. Op., 6/30/16, at 1-5.[2]

On appeal, Father's counsel filed an **Anders** brief and a motion to withdraw with this Court.   As a prefatory matter, we examine whether counsel complied with the requirements of **Anders**, as clarified by the Pennsylvania Supreme Court in **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).

> This Court must first pass upon counsel's petition to withdraw before reviewing the merits of the underlying issues presented by [the appellant].
>
> Prior to withdrawing as counsel on a direct appeal under **Anders**, counsel must file a brief that meets the requirements established by our Supreme Court in **Santiago**.  The brief must:
>
> (1) provide a summary of the procedural history and facts, with citations to the record;

---

[1] **Anders v. California**, 87 S. Ct. 1396 (1967).

[2] We note that the trial court's opinion states that the Philadelphia Department of Human Services ("DHS") filed the petitions to involuntarily terminate Father's parental rights to the Children on November 24, 2015. **See** Trial Ct. Op. at 1.  A review of the record reveals that DHS filed a petition to terminate Father's parental rights to L.A.N. on March 27, 2015. However, that same day, DHS also filed a petition to terminate the parental rights of D.D.M.'s unknown father.  Thereafter, a paternity test determined M.N. to be the father of D.D.M., and DHS filed an amended petition to terminate Father's parental rights to D.D.M. on November 24, 2015.

> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.
>
> **Santiago**, 978 A.2d at 361. Counsel also must provide a copy of the **Anders** brief to his client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the **Anders** brief."

**Commonwealth v. Orellana**, 86 A.3d 877, 879-80 (Pa. Super. 2014) (some citations omitted). If counsel complies with these requirements, "we will make a full examination of the proceedings in the lower court and render an independent judgment [as to] whether the appeal is in fact 'frivolous.'" **Id.** at 882 n.7 (citation omitted). Moreover, "this Court extended the **Anders** principles to appeals involving the termination of parental rights." **In Int. of J.J.L.**, ___ A.3d ___, ___, 2016 WL 6776288 at *3 (Pa. Super. Nov. 15, 2016) (citing **In re V.E.**, 611 A.2d 1267, 1275 (Pa. Super. 1992)).

Instantly, counsel provided a factual and procedural summary of the case with citations to the record. **Anders** Brief at 7-13. Counsel explained the relevant law, discussed why Father's issues are meritless, and determined the appeal is frivolous. **Id.** at 18-26. Counsel provided Father

with a copy of the **Anders** brief and a letter advising Father of his right to retain new counsel or proceed *pro se* to raise additional issues in this Court. **See Orellana**, 86 A.3d at 879-80; Counsel's Mot. to Withdraw, 9/21/16. In light of the foregoing, we hold counsel has complied with the requirements of **Santiago**. **See Orellana**, 86 A.3d at 879-80. Father has not filed a *pro se* or counseled brief. We now examine the record to determine whether the appeal is wholly frivolous. **See id.** at 882 n.7.

The **Anders** brief raises the following issues for our review:

> Whether under the Juvenile Act, 42 Pa.C.S.A. Section 6351, and 55 Pa. Code Section 3130.74, in accordance with the provisions of the Federal Adoption and Safe Families Act, 42 U.S.C. Section 671 *et seq.*, reasonable efforts were made to reunite . . . Father with his Children and whether the goal changes to adoption was the disposition best suited to the safety, protection and physical, mental and moral welfare of the Children.
>
> Whether it was proven by clear and convincing evidence that Father's parental rights should be terminated under Sections 2511(a)(1), (2)[,](5) and (8) [and Section] 2511(b).
>
> Whether there is anything in the record that might arguably support the appeal that obviates a conclusion that the appeal is frivolous.

**Anders** Brief at 6 (capitalization removed).[3]

Appellate review in termination of parental rights cases implicates the following principles:

---

[3] We have reordered Father's issues for ease of disposition.

- 4 -

In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa. Super. 2010) (citation omitted).

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. . . . We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super.) (*en banc*)*, appeal denied*, 863 A.2d 1141 (Pa. 2004) (internal citations omitted).

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa. Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa. Super. 2004).

*In re Z.P.*, 994 A.2d at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa. Super. 2007)).

In the first issue identified by counsel, Father asserts that DHS failed to make reasonable efforts to reunite him with the Children because DHS did not provide him with any necessary paperwork or correspondence regarding the Children. Father also claims the goal change to adoption was not in the best interests of the Children because Father had fulfilled some of his objectives and was on the verge of obtaining stable housing to assume his parental responsibilities of the Children. No relief is due.

Here, the trial court discussed these arguments as follows:

Under 42 Pa.C.S.A. § 6351:

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

      (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

      The Children were in placement for over two years, and [the Community Umbrella Agency] has made numerous attempts to reach out to Father and assist him in meeting his FSP objectives. Certified letters were sent and signed by Father at his only known address. Father was present at three [c]ourt hearings indicating that he had notice of the hearings, and for all of the hearings after May 20, 2013, Father was represented by counsel in all of the proceedings. Further, by Father's own admission, he was aware of the Children being in DHS['s] care since the inception of these cases and has until recently resided in the same place since 2012 and that DHS and the [c]ourts had his address. Based on the record, Father had been re-referred to [the Achieving Reunification Center ("ARC")] on multiple occasions and has not completed them. Further, Father was informed on the days he was present in court of what his objectives were and offered an opportunity to meet [these] objectives.

      For the foregoing reasons, the [c]ourt made reasonable efforts to reunify Father with the Children.

Trial Ct. Op. at 5-6 (footnotes and citations to record omitted). Therefore, we agree with counsel that a review of the facts and the law establish that this issue is frivolous.

In the second issue identified by counsel, Father argues that DHS failed to prove by clear and convincing evidence that Father's parental rights to the Children should be terminated under 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Father contends that the conditions that led to his previous neglect of the Children have been remedied, and Father is best

suited to provide for the Children's developmental, physical, and emotional needs.  No relief is due.

DHS sought involuntary termination of Father's parental rights on the following grounds:

### § 2511.  Grounds for involuntary termination

**(a)  General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*    \*    \*

(5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*    \*    \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." **In re Z.P.**, 994 A.2d at 1117.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted).

With respect to subsection 2511(a)(1), our Supreme Court has held as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1988).

Further, this Court has stated:

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Moreover, under Section 2511(b), the trial court must consider whether termination will meet the child's needs and welfare. ***In re C.P.***, 901 A.2d 516, 520 (Pa. Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of

- 10 -

permanently severing the bond." *Id.* at 520 (citations omitted).

Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P.*, 994 A.2d at 1121 (citations omitted).

Our Supreme Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available

resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

*In re B., N.M.*, 856 A.2d at 855 (citations and quotation marks omitted).

"[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *Id.* at 856.

Instantly, the court concluded:

[T]here is unrefuted evidence that since the Children came into DHS['s] care, they have not resided with Father. Father's visits essentially disappeared from the Children's lives. There was no testimony presented that Father made any outreach to the Children either while he was on bed rest or while he was incarcerated. There was also no mention of any outreach of Father to the Children. Father attended only three court hearings, one court hearing in 2012 and two in 2013. In addition to Father's three court appearances, Father only attended three visits in the year preceding the filing of the Petition for Termination: February 10, 2015, June 10, 2015 and July 8, 2015.

This case is not only one where Father stopped showing up for his Children, but through his own inaction or criminal behavior has not been successful in fulfilling any of his FSP objectives which were mainly drug and alcohol treatment and attend programs through ARC. Father admitted that for at least ten months he was neither able to care for the Children nor fulfill his FSP objectives; for five months he had been in bed rest after being shot. Father was unable to care for his Children after July 8, 2015 because he was incarcerated for five additional months.

Because Father abdicated his parental responsibilities more than six months prior to the actual termination hearing and made no affirmative actions to remain in the Children's lives, the [c]ourt did not err in terminating Father's parental rights . . . .

* * *

[Furthermore,] [t]here was no testimony of a bond between Father and the Children. Father spent less than three hours with them in the last eighteen months.

* * *

Specifically, during Father's only visits with D.D.M., the visit was cut short because of Father's irate behavior. Father was able to visit L.A.N. on two other occasions in 2015.

Conversely, there was testimony that the Children are bonded with their respective foster parent. L.A.N. has been in her current placement for two years and calls her foster parent "Momma De." D.D.M. has been in placement since she was three months old, and she calls her foster parent "mommy." This [c]ourt found that the Children's main source of "love, protection, guidance and support" has been with their respective foster parent, and Father's interactions were almost non-existent. The [c]ourt further found that there would be no detrimental harm if Father's parental rights were terminated.

> Based on the foregoing, this [c]ourt properly found that termination of Father's parental rights would best serve the needs and welfare of the Children.

Trial Ct. Op. at 8-10 (citations to record omitted). Thus, following our review of the record and the law, we agree with Father's counsel that any appeal from this declaration is frivolous.

Finally, regarding Father's last issue, we have conducted an independent review of the record and discovered no other issues of arguable merit. *See Orellana*, 86 A.3d at 882 n.7. Accordingly, we grant counsel's motion to withdraw and affirm the trial court's decrees.

Decrees affirmed. Counsel's motion to withdraw granted.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/13/2017

- 14 -

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FAMILY COURT DIVISION**
**JUVENILE BRANCH**

| | | |
|---|---|---|
| In The Interest Of: | : | CP-51-DP-0001492-2012 |
| | : | *CP-51-AP_0000182-2015* |
| L.A.N., a Minor | : | FID: 51-FN-002326-2012 |
| | : | |
| Appeal of M.N., Father | : | 149 EDA 2016 |

| | | |
|---|---|---|
| In The Interest Of: | : | CP-51-DP-0000110-2013 |
| | : | *CP-51-AP 0000183-2015* |
| D.D.M., a Minor | : | FID: 51-FN-002326-2012 |
| | : | |
| Appeal of M.N., Father | : | 107 EDA 2016 |

## OPINION

This Opinion is submitted relative to the appeal of Father, M.N. ("Father"), from this Court's Order dated December 11, 2015. For the reasons discussed, this Court respectfully submits that its decision should be affirmed. This case is one where the Father abandoned L.A.N. and D.D.M. (collectively referred to as "the Children"). Father presented two main reasons for his extended absence from the Children: a recent five month incarceration and being bedridden after being shot in his groin. He did not keep in contact with the Children or the social services team to maintain a relationship despite his physical limitations/incarceration.

### Background

On August 31, 2012, L.A.N. was adjudicated dependent and committed to DHS care. On January 24, 2013, D.D.M. was adjudicated dependent and committed to DHS care.

The Petitions for Involuntary Termination of Parental Rights was filed on November 24, 2015. The Termination Hearing was held on December 11, 2015. During the hearing, the Court heard from two witnesses: Precious Randall (APM CUA) and Father.

1

Ms. Randall testified that Father's FSP objectives were: random drug screens, follow CEU recommendations and to attend ARC (parenting, reunification, visitation, anger management, drug and alcohol, drug and alcohol support, job training, housing and employment). N.T. 12/11/15 at 8. Ms. Randall indicated that despite Father receiving certified mail with the Children's visitation schedules, Father only attended 3 total visits with the Children in 2015. Id. at 10, 29-30. There were 3 visits with L.A.N.[1] (February 10, 2015, June 10, 2015 and July 8, 2015[2]) and one with D.D.M.[3] (June 10, 2015). Id. at 10. On June 10, 2015, the visit between Father and the Children was cut short because of Father's irate behavior. Id. at 10.

Ms. Randall also indicated that although Father was referred to ARC three times, he never followed up on the referrals. Id. at 9. Father was sent numerous notices at the only address he had listed. Id. at 11. On one occasion, Ms. Randall met Father outside of his listed address on October 22, 2014. Id. When Ms. Randall spoke to Father, she stated that the Children were in placement and talked about his visitations, ARC, the ongoing services available and the need for a home assessment. Id. at 11-12. A home assessment was scheduled, but Father was not present. Id. at 12.

As of the date of the termination petitions for the Children, Father had not completed any of his FSP objectives. Id. at 13.

Ms. Randall then testified that L.A.N. had a strong bond with her foster parent over the last two years and called her "Momma De." Id. at 14, 23. Additionally, Ms. Randall stated that

---

[1] For a total of 3 hours in the past 18 months. Id. at 22.-23.
[2] Father was incarcerated on the same day as this visitation. Id. at 27.
[3] For a total of 1 hour in the last 18 months. Id. at 23.

2

D.D.M., who has been with her foster mother since she was three months old, calls her foster mother "mommy." Id. at 14-15, 25.

On December 11, 2015, Father testified that this was his first time in the new courtroom[4]. Id. at 32. During direct examination, Father stated that he was aware of the DHS case since the Children first came into care because he was living with L.M. ("Mother") during his first appearance in Court. Id. at 31-32. Prior to L.A.N.'s placement with DHS, she had never lived with Father, and D.D.M. was not yet born. Id. at 34, 39. The Children were taken out of Mother's ("Mother") care while Father was living with his sister. Id. at 39.

Father also testified that because he was locked up for five months in 2015, he was not able to complete his FSP objectives. Id. at 35, 37. Father admitted that he had resided in the same place since 2012 and that CUA had his proper address which changed recently as a result of a fire. Id. at 36, 38, 43-44. Father also testified that he was on bed rest for about 5 months in 2014 after being shot in his right groin area and was not able to care for his children. Id. at 36, 42-43. Father had access to a phone while he was on bed rest but did not call the Children. Id. at 42. Father stated that "I love my daughters...I mean I'm going through something right now..." Id. at 40.

After closing arguments, the Court made the following findings as to the credibility of the witnesses: 1) Ms. Randall was credible and her testimony accepted in full; and 2) Father was credible and his testimony accepted in full.

In particular, the Court stated:

---

[4] It should be noted that the new Family Court building has been open since January 4, 2015.

3

Ms. Randall testified that [F]ather made no visits to [C]ourt. That is not the case. Father came to [C]ourt **November 26, 2012**[5], looking at the permanency review order. That was his first hearing...Then for a period of time father did not show up...Then I did not see dad until **May 20, 2013**[6]...At that time, we did the paternity test [for D.D.M.]... I saw father again **August 19, 2013**[7]. This states [that] on August 19, 2013 father has weekly supervised visits. At that point visits were consistent and in fact I ordered father's visits, they could be modified...Then in all honesty I didn't see father any more. Those are the times that father showed up in court. I took the time to go through all of my notes to determine when father was here. And the times that I've given you are the times that father appeared based upon my notes[8]...But since then father has been absent...I have nothing for 2014. I have nothing for 2015.

Id. at 50-51(emphasis added). The Court further noted that Father had an affirmative duty to the Children "even when things are going bad." Id. at 51. To Father, the Court stated that "for some reason at some point in time you gave up and stopped. But the [C]hildren were cared for by someone else. Someone else took over your job because you abdicated your role that [was] non-transferable." Id. at 52.

The Court found that the Child Advocate had met its burden and presented clear and convincing evidence to support the termination of Father's parental rights under 23 Pa. C.S. §§ 2511(a)(1),(2), (5) and (8) of the Adoption Act. Id. at 52. Pursuant to 23 Pa. C.S. § 2511(b), the Court further found that with L.A.N., there was a "bond but not a substantial bond," and there

---

[5] *See* also Court's Exhibit "A" (Permanency Order from November 26, 2012 for L.A.N.). During Father's first hearing, he was appointed counsel and referred for a forthwith drug screen.

[6] *See* also Court's Exhibit "B" (Permanency Orders from May 20, 2013 for the Children.). During this hearing, Father had attended 9 out of 11 visits of supervised visits. Father's visits were permitted to be modified after a negative drug screen. Father was also re-referred to the ARC program. DHS was asked to explore paternal relative's sibling family as a possible placement resource.

[7] *See* also Court's Exhibit "C" (Permanency Orders from August 19, 2013 for the Children). Father's visits with L.A.N. were to be modified to unsupervised day visits, with a negative drug screen. Father's visits with D.D.M.

[8] From the Court Orders of L.A.N., Father had been present three out of eleven hearings (excluding the Termination Hearing and continuances) since the Adjudication Hearing. The dates Father missed for L.A.N. were: 8/31/12(adjudicatory hearing), 11/18/13, 1/8/14, 4/1/14, 6/23/14, 9/16/14, 4/22/15, 9/11/15. The dates Father missed for D.D.M since a paternity test was ordered on May 20, 2013 for him were: 8/19/13, 1/8/14, 4/1/14, 6/23/14, 9/16/14, 4/22/15, 9/11/15.

would be no irreparable harm if the bond was terminated. Id. at 52-53. However, the Court did

find there was a bond with L.A.N. and her foster parent. Id. at 53. With D.D.M., the court found

that Father had only visited the child once on June 10, 2015 and was not bonded to the child. Id.

at 53-54. Based on Father's one visit with the child, there would be no irreparable harm if

Father's rights were terminated. Id. at 54. However, the Court found that D.D.M. had a loving

and supportive bond with her foster parent. Id.

On appeal, Father argues that[9]:

1. Whether under the Juvenile Act, of 42 Pa.C.S.A. Section 6351, and 55 Pa.Code Section 3130.74, in accordance with the provisions of the Federal Adoption and Safe Families Act, 42 U.S.C. Section 671 et seq., reasonable efforts were made to reunite Father with his child and whether the goal of adoption was the disposition best suited to the safety, protection and physical, mental and moral welfare of the child.

2. Whether it was proven by clear and convincing evidence that Father's parental rights should be terminated under Sections 2511 (a)(2) and 2511 (b)[.]

## I. Reasonable Efforts were made to Reunite Father with the Children and the Goal of Adoption was in the best interest of the Children.

Father argues that there were no reasonable efforts made to reunify him with the

Children. Under 42 Pa. C.S.A § 6351:

> (9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:
> > (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
> > (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

[9] Sic.

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

The Children were in placement for over two years, and CUA has made numerous attempts to reach out to Father and assist him in meeting his FSP objectives. N.T. 12/11/15 at 11, 22-23. Certified letters were sent and signed by Father at his only known address. Id. at 29-30. Father was present at three Court hearings indicating that he had notice of the hearings, and for all of the hearings after May 20, 2013, Father was represented by counsel in all of the proceedings. Further, by Father's own admission, he was aware of the Children being in DHS care since the inception of these cases and has until recently resided in the same place since 2012 and that DHS and the Courts had his address[10]. Id. at 36, 38. Based on the record, Father had been re-referred to ARC on multiple occasions and has not completed them. Id. at 9. Further, Father was informed on the days he was present in court of what his objectives were and offered an opportunity to meet this objectives[11].

For the foregoing reasons, the Court made reasonable efforts to reunify Father with the Children.

## II.      There was Sufficient Evidence to Change the Goal to Adoption and Terminate Father's Parental Rights Under 2511(a) and 2511(b).

A court's decision on whether to terminate parental rights is governed by the statutory requirements of 23 Pa. C.S. § 2511. In re Child M., 681 A.2d 793, 797 (Pa. Super. 1996). The

___

[10] Father does not currently reside in his house as a result of a recent fire. Id. at 38.

[11] On November 26, 2012, Father was referred for a forthwith drug screen. On May 20, 2013, Father was offered the opportunity to modify his visits if he had a negative drug screen. Also during the May hearing, Father was offered an opportunity to prove paternity for D.D.M and was offered supervised visits with the child. On August 19, 2013, Father was re-referred to the CEU and his visits were modified with L.A.N. to unsupervised visits.

"party seeking to terminate parental rights bears the burden of proving by clear and convincing evidence the statutory grounds for doing so." Id. Appellate review of an order terminating parental rights is limited to a determination of whether the decision of the trial court is supported by competent evidence. In re B.L.W., 843 A.2d 380, 383 (Pa. Super. 2004). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." Id.

Father's second issue questions whether there is clear and convincing evidence that Father's parental rights should be terminated under 2511(a) and 2511(b).

### a. There was Sufficient Evidence to Support 2511(a).

In the present case, DHS brought its petition for involuntary termination of Father's parental rights under 23 Pa. C.S. §§ 2511(a)(1),(2),(5), and (8) of the Adoption Act, which provide, in pertinent part, that the rights of a parent may be terminated upon any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable

7

period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

The Court found that there was sufficient evidence to terminate Father's parental rights based on 2511(a)(1), (2), (5) and (8).

In the instant case, there is unrefuted evidence that since the Children came into DHS care, they have not resided with Father. Father's visits never went past unsupervised day visits. N.T. 12/11/15 at 51-52. After a period of time, Father essentially disappeared from the Children's lives. There was no testimony presented that Father made any outreach to the Children either while he was on bed rest or while he was incarcerated. Id. at 42. There was also no mention of any outreach of Father to the Children. Father attended only three court hearings, one court hearing in 2012 and two in 2013. In addition to Father's three court appearances, Father only attended three visits in the year preceding the filing of the Petition for Termination: February 10, 2015, June 10, 2015 and July 8, 2015. Id. at 10.

This case is not only one where Father stopped showing up for his Children, but through his own inaction or criminal behavior has not been successful in fulfilling any of his FSP objectives which were mainly drug and alcohol treatment and attend programs through ARC. Id. at 8. Father admitted that for at least ten months he was neither able to care for the Children nor fulfill his FSP objectives; for five months he had been on bed rest after being shot. Father was unable to care for his Children after July 8, 2015 because he was incarcerated for five additional months. Id. at 27, 35, 37.

8

Because Father abdicated his parental responsibilities more than six months prior to the actual termination hearing and made no affirmative actions to remain in the Children's lives, the Court did not err in terminating Father's parental rights under 2511(a)(1), (2), (5), and (8).

### b. There was no parent-child bond under 2511(b)

There was no testimony of a bond between Father and the Children. Father spent less than three hours with them in the last eighteen months. Id. at 22-23.

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

In re Z.P., 994 A.2d 1108, 1118-19 (2010).

Specifically, during Father's only visit with D.D.M., the visit was cut short because of Father's irate behavior. Id. at 10. Father was able to visit L.A.N. on two other occasions in 2015. Id. at 10.

Conversely, there was testimony that the Children are bonded with their respective foster parent. Id. at 14-15, 23, 25. L.A.N. has been in her current placement for two years and calls her foster parent "Momma De." Id. at 14, 23. D.D.M. has been in placement since she was three months old, and she calls her foster parent "mommy." This Court found that the Children's main source of "love, protection, guidance and support" has been with their respective foster parent,

and Father's interactions were almost non-existent. Id. at 51-54. The Court further found that there would be no detrimental harm if Father's parental rights were terminated. Id.

Based on the foregoing, this Court properly found that termination of Father's parental rights would best serve the needs and welfare of the Children.

## Conclusion

For these reasons, the Court respectfully submits that its decision be affirmed.

BY THE COURT,

_____
VINCENT L. JOHNSON, J.

Dated: June 29, 2016

10